GEOFFREY HANSEN
Acting Federal Public Defender
Northern District of California
JOYCE LEAVITT
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:    (510) 637-3500
Facsimile:    (510) 637-3507
Email:        Joyce_Leavitt@fd.org


Counsel for Defendant Odom

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 21–00259 JST |
| Plaintiff, | **DEFENDANT'S REPLY TO MOTION TO SUPPRESS EVIDENCE** |
| v. | **Court:**          Courtroom 6, 4th  Floor |
| CAMERON ODOM, | **Hearing Date:**  January 7, 2022 |
| Defendant. | **Hearing Time:**  2:00 p.m. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... **Error! Bookmark not defined.**

INTRODUCTION ................................................................................................................ 1

FACTS ................................................................................................................................. 1

ARGUMENT ....................................................................................................................... 4

I.     Officer Guajardo unconstitutionally prolonged the traffic stop by asking about Mr. Odom's probation and parole status ......................................................................... 4

II.    Officer Guajardo unconstitutionally prolonged the traffic stop by running a CRIMS check on Mr. Odom ................................................................................................. 7

    A.    Guajardo's CRIMS check added time to the traffic stop ..................................... 7

    B.    Guajardo's CRIMS check was not part of the traffic-stop mission ..................... 8

    C.    The government has not shown that Guajardo had reasonable suspicion to prolong the stop to run the CRIMS check .......................................................... 10

III.    The government has not carried its burden of establishing a lawful tow ....................... 11

    A.    The government has not carried its burden of showing that the inventory search and tow of the car were constitutional ................................................................. 11

    B.    The record establishes that the tow and inventory search were unconstitutionally pretextual ............................................................................................................. 13

IV.    The government has not shown that the pat-search of Mr. Odom was constitutional .... 14

V.    The government has not established any exception to the exclusionary rule ................. 18

CONCLUSION ................................................................................................................... 20

1

**TABLE OF AUTHORITIES**

2    **Federal Cases**

3    *Amanuel v. Soares,*
4        No. 13-cv-05258 NC, 2015 WL 3523173 (N.D. Cal. June 3, 2015) ................................ 5

5    *Arizona v. Johnson,*
         555 U.S. 323 (2009) ................................................................. 16, 19
6
     *Burrell v. McIlroy,*
7        464 F.3d 853 (9th Cir. 2006) ................................................... 17

8    *Davis v. United States,*
         564 U.S. 229 (2011) .................................................................. 19
9
     *Knowles v. Iowa,*
10       525 U.S. 113 (1998) .................................................................. 18

11   *Menotti v. City of Seattle,*
12       409 F.3d 1113 (9th Cir. 2005) ................................................... 18

13   *Minn. v. Dickerson,*
         508 U.S. 366 (1993) ......................................................... 14-15, 15
14
     *Miranda v. City of Cornelius,*
15       429 F.3d 858 (9th Cir. 2005) ................................................... 12

16   *Murillo v. City of Woodland,*
17       2011 WL 3028543 (E.D. Cal. 2011) ...................................... 15, 16

18   *Ramirez v. City of Buena Park,*
         560 F.3d 1012 (9th Cir. 2009) ................................................... 15
19
     *Rodriguez v. United States,*
20       575 U.S. 348 (2015) ............................................................ 5, 8, 9

21   *Thomas v. Dillard,*
22       818 F.3d 864 (9th Cir. 2016) .............................................. 15, 16

23   *Thornton v. United States,*
         541 U.S. 615 (2004) .................................................................. 18
24
     *United States v. $32,750 in U.S. Currency,*
25       200 F. Supp. 3d 1132 (D. Nev. 2016) ...................................... 11

26   *United States v. Artis,*
         919 F.3d 1123 (9th Cir. 2019) ................................................... 19
27
     *United States v. Brown,*
28       925 F.3d 1150 (9th Cir. 2019) ............................................ 11, 12

*United States v. Brown*,
   996 F.3d 998 (9th Cir. 2021) ................................................................. 16

*United States v. Camou*,
   773 F.3d 932 (9th Cir. 2014) ................................................................. 19

*United States v. Caseres*,
533 F.3d 1064 (9th Cir. 2008) ................................................................ 13, 19

*United States v. Cervantes*,
   703 F.3d 1135 (9th Cir. 2012) ........................................................ 12, 13, 19

*United States v. Clark*,
   902 F.3d 404 (3d Cir. 2018) .............................................................. 6, 7, 9

*United States v. Cornejo*,
   196 F. Supp. 3d 1137 (E.D. Cal. 2016) ................................................. 19

*United States v. Cotterman*,
   709 F.3d 952 (9th Cir. 2013) ................................................................. 17

*United States v. Crenshaw*,
   No. 20-cr-00015-JD-1, 2020 WL 6873422 (N.D. Cal. Nov. 23, 2020) ......................... 6

*United States v. Evans*,
   786 F.3d 779 (9th Cir. 2015) ......................................................... 5, 8, 9, 10

*United States v. Freeman*,
   726 F. App'x 662 (9th Cir. 2018) ........................................................... 6

*United States v. Garner*,
   152 F. App'x 612 (9th Cir. 2005) .......................................................... 16

*United States v. Gorman*,
   859 F.3d 706 (9th Cir. 2017) ............................................................ 7, 19

*United States v. I.E.V.*,
   705 F.3d 430 (9th Cir. 2012) ...................................................... 15, 16, 17, 19

*United States v. Johnson*,
   889 F.3d 1120 (9th Cir. 2018) ............................................................. 13

*United States v. Landeros*,
   913 F.3d 862 (9th Cir. 2019) ............................................................ 6, 19

*United States v. Maffei*,
   417 F. Supp. 3d 1212 (N.D. Cal. 2019) .............................................. 12, 13, 18

*United States v. Mati*,
   466 F. Supp. 3d 1046 (N.D. Cal. 2020) .............................................. 5, 6, 7, 11

*United States v. Mattarolo*,
  209 F.3d 1153 (9th Cir. 2000) ........................................................ 16

*United States v. Ngumezi*,
  980 F.3d 1285 (9th Cir. 2020) ................................................ 7, 18, 19

*United States v. Perez*,
  603 F. App'x 620 (9th Cir. 2015) .................................................. 17

*United States v. Taylor*,
  716 F.2d 701 (9th Cir. 1983) ........................................................ 16

*United States v. Torres*,
  828 F.3d 1113 (9th Cir. 2016) .................................................. 12, 13

*United States v. Turnbow*,
  2019 WL 654456 (D. Nev. 2019) .............................................. 13, 14

*United States v. Ward*,
  No. 16-cr-00485-JST-1, 2017 WL 1549474 (N.D. Cal. May 1, 2017) ................. 5, 7, 18

*Utah v. Strieff*,
  136 S. Ct. 2056 (2016) ............................................................ 18

**State Statutes**

Cal. Veh. Code § 12500 ............................................................ 12

Cal. Veh. Code § 22651 ............................................................ 12

**INTRODUCTION**

The government at least implicitly concedes that CHP officer Guajardo prolonged the traffic stop of Mr. Odom by asking him about his probation and parole status.  This prolongation, alone, violated the Fourth Amendment.

Guajardo further prolonged the traffic stop by running a criminal-records check of Mr. Odom, separate from the DMV check.  Although Guajardo's declaration says that *dispatch* did the DMV checks *while* he did the CRIMS record check from his patrol car, the record establishes that *he* did the DMV records checks and the CRIMS check on his mobile digital computer.  His prolongation of the traffic stop to run the CRIMS check violated the Fourth Amendment.

The government also has not carried its burden of establishing that either the warrantless tow and search of the car or the warrantless pat-search of Mr. Odom was constitutional.  It has not even attempted to show that the tow and search of the car conformed with any standardized police procedure.  It has not even attempted to show that the tow was justified by any community caretaking purpose.  Nor has it shown that Guajardo had reasonable suspicion that Mr. Odom was presently armed and dangerous, as required for a pat-search for weapons.

The discovery of the gun was the fruit of each and all of these Fourth Amendment violations.  The government has not even attempted to establish any exception to the exclusionary rule.  All fruits of this unconstitutional police conduct must be suppressed.

**FACTS**

Mr. Odom disagrees with the government's statement of facts on the following key points:

- **Mr. Odom did not tell Guajardo "that the vehicle belonged to his sister who lived a few blocks down Liberty Avenue."**  Opposition to Defendant's Motion to Suppress ["Opp."] at 1-2.

  Guajardo's declaration states that Odom told him "that the vehicle belonged to his sister who lived up the street from where the vehicle was currently stopped." Declaration of CHP Xavier Guajardo in Support of Government's Opposition to Defendant's Motion to Suppress ["Guajardo Decl."] ¶ 5.  His police report is consistent with his declaration.  Exhibit 1 to Declaration of Joyce Leavitt ["Leavitt Decl."] (Bates 23).  But both his declaration and his police report conflict with the dashcam.

1    The dashcam shows that Mr. Odom told Guajardo that it was his sister's car.

2    Exhibit A to Opp. ["Dashcam"] 2:00.  A few questions later, in response to Guajardo

3    asking "*How far are you from home*?" Mr. Odom said, "Literally right up the street."

4    *Id.* 2:15.  Guajardo then confirmed, "It's registered to your sister?" and then asked, "Is

5    this your address on Fern Street?"  *Id.* 2:20-2:35.  Mr. Odom thus told Guajardo that *he*,

6    not his sister, lived up the street.

7    • **Guajardo did not "request[] a DMV records check from dispatch while he
8    returned to the patrol vehicle and d[o] a records check using the Alameda
9    Criminal Records Information Management System"** ["CRIMS"].  Opp. at 2; *see
     also* Guajardo Decl. ¶ 6 (same).

10   Guajardo's sworn declaration to establish probable cause for Mr. Odom's arrest

11   states, "I conducted a DMV records check using my Mobile Digital Computer

12   ["MDC"]."  Exh. 1 to Leavitt Decl. (Bates 10).  His probable-cause declaration is

13   consistent with his police report, which also states that *he*, not dispatch, did the DMV

14   records check on Mr. Odom and the car using his MDC.  *Id.* (Bates 23).

15   The government provided in discovery printouts that appear to be DMV checks

16   of the car and of Mr. Odom run from the MDC.  *See id.* (Bates 30: car check, apparently

17   run August 26, 2020, at 2:23); *id.* (Bates 8: Odom check, apparently run August 26,

18   2020, at 2:25).  The dashcam audio also corroborates Guajardo's roughly-

19   contemporaneous-to-the-incident police report and probable-cause statement that he did

20   *not* ask dispatch to run the DMV checks.  Although it captures his voice during his

21   conversation with Mr. Odom and on two telephone calls and even picks up some of

22   what are apparently dispatcher voices in the background,[1] it does not reflect any

23   communications between Guajardo and dispatch about a DMV check of Mr. Odom or

24   the vehicle.

25   Moreover, the dispatch audio recording and printed incident detail that the

26   government provided in discovery do not reflect the communications with dispatch that

27   _____

28   [1] *See* Dashcam 17:20, 34:20 (Guajardo's phone calls); Dashcam 8:35, 8:50, 10:15, 20:50 (apparently
     dispatcher's voice); Dashcam 45:05, 49:20 (Guajardo apparently talking to dispatch).

1    Guajardo claimed in his declaration, Guajardo Decl. 6.  *See* Exh. 1 to Leavitt Decl.

2    (Bates 33); Exh. 2 to Leavitt Decl.  According to the Incident Detail Report, Guajardo's

3    and Lee's first communication with dispatch was at 2:32:52, when they reported

4    "1015," which is the code for a prisoner in custody.  Leavitt Dec. ¶ 5 and Exh. 1 (Bates

5    33).[2]  Less than four minutes after that, at 2:36:44, the officers requested a check [code

6    "29"] on the gun they already had recovered from Mr. Odom.  *Id*; *see also id.* Exh. 2

7    (audio reflecting Guajardo's first request for a check is for the gun).  It is only several

8    minutes after that, starting at 2:43:23, that there is a request to check a driver's license,

9    "1127," followed by a "Vehicle Inquiry" and inquiries into Mr. Odom by name.  *Id.*

10    Exh. 1 (Bates 33).  The dispatch audio recording provided by the government in

11    discovery is consistent with the printed incident detail and begins with a reference to

12    "1015."  *Id.* Exh. 2.

13          Moreover, the dashcam indicates that a DMV check had been run on the car

14    even before the stop, because Guajardo knew the car's Vehicle Identification Number

15    ["VIN"].  When he approached the stopped car, Guajardo went immediately to the

16    passenger-side window, Dashcam 1:30, and Lee stood near the rear driver's side of the

17    car.  *Id.* 1:40.  After Guajardo talked with Mr. Odom, both officers walked towards the

18    back of the car.  *Id.* 2:55.  Guajardo told Lee to "check the last four," *id.* 2:56; and Lee

19    immediately walked to the front driver's side and briefly leaned towards the windshield.

20    Guajardo then said, "Four-four-two-two, is that it?"  *Id.* 2:58.  Four-four-two-two are

21    the last four digits of the car's VIN.  Exh. 1 to Leavitt Decl. (Bates 30).  Based on his

22    actions during the stop to that point, as recorded by the dashcam, Guajardo could not

23    have known that those were the last four digits of the car's VIN unless he had obtained

24    that information *before the dashcam audio began*.  Yet Guajardo's declaration does not

25    mention any records check before stopping Mr. Odom.

26    •   **The government has not shown that Guajardo's CRIMS check provided the**

27    _____

28    [2] "1015" also is the code for the "Problem" when the contact with dispatch was initiated.  Exh. 1 to
      Leavitt Decl. (Bates 33).

**details about Mr. Odom's criminal history on which it relies.**  Opp. at 2.

Guajardo's probable-cause statement says only that the CRIMS check "show[ed] Odom to be affiliated with criminal gang activity."  Exh. 1 to Leavitt Decl. (Bates 10).  His police report says that CRIMS showed the affiliation with criminal gang activity and "prior firearms charges with prior convictions."  *Id.* (Bates 24).  His declaration says only that "[t]he CRIMS records check revealed that Odom had affiliations with criminal gang activity and . . . firearms-related criminal history."  Guajardo Decl. ¶ 7.  The government thus has not shown that Guajardo had any information from his initial CRIMS check about the recency of any gang or gun activity or prior convictions.

Guajardo was not an experienced officer.  He had been a CHP employee for just over four years at the time of the stop in this case.  Guajardo Decl. ¶¶ 1, 3.  He had "participated in" only "several arrests and traffic stops involving firearms recovery."  *Id.* ¶ 2.  During the stop, he made two phone calls to ask advice about procedures and charging.  Dashcam 17:20 (asking whether he should take the phone); *id.* 35:23 (asking about charges for extended magazine and gang activity).  As the government acknowledges, "the patrol vehicle dash camera footage speaks for itself regarding what happened on August 26, 2021."  Opp. at 11.

## ARGUMENT

### I.  Officer Guajardo unconstitutionally prolonged the traffic stop by asking about Mr. Odom's probation and parole status

After Mr. Odom provided his California identification card, Guajardo "asked Odom if he was on probation or parole."  Guajardo Decl. ¶ 5.  Guajardo states that he asked this question "[a]s a safety precaution."  *Id.*  The only allegations specific to Mr. Odom that he offers to support any safety concerns is that Mr. Odom "appeared nervous" and "was shifting and moving around in the vehicle."  *Id.*  He did not explain why asking this question would improve his safety.

The government acknowledges Guajardo's questioning about "probation and post-community supervision . . . status."  Opp. at 7.  It also acknowledges that courts have held that "probation/parole verification is outside the scope of a routine traffic stop."  *Id.* at 6-7 & n.6 (discussing and citing cases).  In fact, several judges of this Court have held that an officer's *questions* about probation and

1  parole status are outside the scope of a routine traffic stop and, when such questions add time to the

2  stop, prolong it in violation of the Fourth Amendment.

3         In *United States v. Ward*, this Court held that the officer's questions, including "whether Ward

4  was on probation on parole," were "'wholly unrelated to [the officer's] mission of "ensuring that

5  vehicles on the road are operated safely and responsibly."'"  2017 WL 1549474, at *3 (N.D. Cal.

6  2017) (quoting *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015), quoting *Rodriguez v.*

7  *United States*, 575 U.S. 348, 355 (2015)); *see also Amanuel v. Soares*, 2015 WL 3523173, at *7

8  (N.D. Cal. 2015) (holding that officer's "confirm[ing] with Amanuel that he is not on probation or

9  parole" and asking about a prior arrest were unrelated to traffic-stop mission).  And in *United States*

10 *v. Mati*, another judge of this Court agreed "that asking a driver about his probation status . . . is not

11 aimed at ensuring that vehicles on the road are operated safely and responsibly.  Asking whether a

12 driver is on probation and has a search condition is, instead, intended to uncover evidence of criminal

13 activity."  466 F. Supp. 3d 1046, 1056 (N.D. Cal. 2020) (noting also that several California

14 jurisdictions have "prohibit[ed] law enforcement from asking such questions").  *Mati* and *Ward* also

15 rejected the claimed safety justification for questioning about probation and parole status.  466 F.

16 Supp. 3d at 1057.  "[T]he Ninth Circuit has twice observed that spending more time with a driver to

17 ask him unnecessary questions actually has an inverse relationship to safety."  *Id.*

18        Although the government claims that Guajardo asked about parole and probation status "during

19 a permissible line of questioning,"  Opp. at 7, it apparently concedes that his question about probation

20 and parole status was "unrelated to the mission of the stop."  *Id.* at 8.  But it argues that this case "is

21 wholly distinguishable from *Ward*" because the officer here asked "fewer inquiries" outside the

22 traffic-stop mission; his "unrelated inquiry did not lead directly" to the gun; and the stop here "was

23 incomplete."  *Id.*  None of the government's claimed distinctions holds up.

24        The government has not pointed to any authority that the *number* of unrelated questions

25 matters; indeed, it acknowledges that the relevant legal inquiry is whether any such questions have a

26 "measurable effect" on or "add[] time to" the stop.  *Id.* at 5; *see Mati*, 466 F. Supp. 3d at 1059

27 (questioning and checking about search condition "added time to the detention").  The government

28 does not claim that Guajardo's question about probation and parole did not add any time to the stop.

DEFENDANT'S REPLY TO MOTION TO SUPPRESS EVIDENCE
*ODOM*, CR 21–00259 JST

5

1   "[I]t does not matter that the time added was relatively short." *Mati*, 466 F. Supp. 3d at 1058; *see*

2   *also United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019)("*Rodriguez* squarely rejected . . . a

3   reasonableness standard for determining whether prolonging a traffic stop for reasons not justified by

4   the initial purpose of the stop is lawful."); *United States v. Clark*, 902 F.3d 404, 410 n.4 (3d Cir.

5   2018) (noting the "explicit rejection of a de minimis exception in *Rodriguez*" and finding

6   unconstitutional prolongation based on 20-second questioning of driver about criminal history).  Nor

7   does the government claim that Guajardo had reasonable suspicion at that point to prolong the traffic

8   stop.

9        The government's argument that the stop was not completed and could not have been

10   completed when Guajardo asked the question is beside the point.  Opp. at 7.  Officers doing tasks

11   unrelated to the traffic-stop mission, like asking about probation and parole status, violate the Fourth

12   Amendment when they "prolong the stop," whether the prolongation occurs after or before the

13   necessary traffic-related tasks are completed.  "What mattered [in *Rodriguez*] was the added time, not

14   at what point, in the chronology of the stop, that time was added."  *Landeros*, 913 F.3d at 866.

15        The cases the government relies on are distinguishable because in those cases, but not here, the

16   challenged inquiries "occur[red] simultaneously with other [legitimate] traffic-related checks."  Opp.

17   at 5-6.  In *United States v. Freeman*, the allegedly prolonging conduct "did not prolong the stop

18   because [one officer] did so while his partner was still involved with tasks tied to the traffic

19   infraction."  726 F. App'x 662, 664 (9th Cir. 2018) (unpublished) (brackets added; internal quotation

20   marks omitted).  Similarly, in *United States v. Crenshaw*, two officers were conducting

21   "simultaneous interaction[s]," one (concededly legitimate) looking into the driver's registration while

22   the other (challenged) asking the defendant-passenger for identification and about his probation

23   status.  2020 WL 6873422, at *4 (N.D. Cal. 2020).

24        Here, although two officers were present, in contrast to *Freeman* and *Crenshaw*, only one

25   officer was processing the traffic violation.  Guajardo *interrupted* his traffic-related tasks of obtaining

26   license and registration information from and running a DMV check on Mr. Odom and the car to

27   "ask[] Odom if he was on probation or parole."  Guajardo Decl. ¶¶ 5-6.  Here, as in *Ward* and *Mati*,

28   the officer's brief interruption of the traffic-stop processing to question the driver about matters

DEFENDANT'S REPLY TO MOTION TO SUPPRESS EVIDENCE
*ODOM*, CR 21–00259 JST

6

1   unrelated to the traffic-stop mission "measurably extended the duration" of the traffic stop.  466 F.

2   Supp. 3d at 1058-59;  2017 WL 1549474, at *3.  Under *Rodriguez* and the cases following it, this

3   prolongation violated the Fourth Amendment.

4          The unconstitutional prolongation of the stop from Guajardo's questioning Mr. Odom about his

5   probation and parole status warrants suppression.  On this point, the government says only that

6   Guajardo's "unrelated inquiry did not lead directly to the loaded firearm later recovered from Odom's

7   person."  Opp. at 8.  But the exclusionary rule applies not only to evidence obtained directly from a

8   Fourth Amendment violation but also to "the indirect products of such invasions."  *United States v.*

9   *Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (ellipses and internal quotation marks omitted).  As the

10  Third Circuit put it, "If the traffic stop was impermissibly extended to reach [the point at which the

11  challenged evidence was discovered], any evidence seized after the stop should have ended may be

12  suppressed" under *Rodriguez*.  *Clark*, 902 F.3d at 406.  The government bears the burden of

13  establishing that evidence is not the fruit of a Fourth Amendment violation.  *United States v.*

14  *Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020).  Because it has not carried that burden here, "[t]he

15  exclusionary rule generally applied in Fourth Amendment cases," *id.* at 1290, applies here.

16  **II.    Officer Guajardo unconstitutionally prolonged the traffic stop by running a CRIMS
          check on Mr. Odom**

17

18         In addition to DMV checks on Mr. Odom and the car, Guajardo also ran a check on Mr. Odom

19  through CRIMS.  Guajardo Decl. ¶ 6.  CRIMS includes "criminal court records, inmate booking

20  information, wants/warrants, probation/parole status, and information regarding contacts with law

21  enforcement for Alameda County."  *Id.* ¶ 8.  In other words, a CRIMS check is a criminal-activity

22  check.  Because this criminal-activity check both added time to the stop and was outside the traffic-

23  stop mission, Guajardo's prolonging the stop to run it violated the Fourth Amendment.

24         **A.    Guajardo's CRIMS check added time to the traffic stop**

25         As discussed in the Facts section, above, Guajardo's two sworn statements about how the

26  records checks in this case were conducted contradict each other.  Guajardo's declaration filed by the

27  government in support of its opposition says that he "*requested dispatch* run a DMV records check of

28  the vehicle and Odom *while I did [a CRIMS] records check* from the patrol vehicle."  Guajardo Decl.

1    ¶ 6 (emphases added).  But his sworn probable-cause declaration, supported by the other evidence

2    provided by the government in discovery (as outlined above), states, "*I conducted a DMV records*

3    *check* using my Mobile Digital Computer."  Exh. 1 to Leavitt Decl. (Bates 10).

4         This conflict in Guajardo's sworn statements is significant for the question of whether he

5    unconstitutionally prolonged the traffic stop by checking CRIMS.  The government relies on the

6    version in Guajardo's declaration, arguing, for example, that Guajardo acted "reasonably and in good

7    faith" because he "even reached out to dispatch for the DMV check while he simultaneously checked

8    the CRIMS records, essentially expediating the traffic stop where he could."  Opp. at 10; *see also*

9    Opp. at 2, 7 (referring to how DMV and CRIMS check were done).  But the record as a whole

10   discredits Guajardo's declaration on this point.  The rest of the evidence, which indicates that *he* did

11   both types of checks *sequentially*, shows that the CRIMS check added time to the stop.[3]

12        **B.       Guajardo's CRIMS check was not part of the traffic-stop mission**

13        The government argues that Guajardo lawfully ran the CRIMS check "to ascertain further

14   information about Odom, including whether he had any outstanding warrants, Odom's

15   probation/parole status, and other information."  Opp. at 7.  Only *one* of those purposes -- checking

16   whether a driver has any outstanding warrants -- was included in *Rodriguez*'s list of permissible

17   traffic-stop tasks.  575 U.S. at 355.  But *Rodriguez*'s explanation for allowing checks for a driver's

18   outstanding warrants is that it "'makes it possible to determine whether the apparent traffic violator is

19   wanted for one or more previous *traffic* offenses.'"  *Id.* (quoting 4 W. LaFave, *Search and Seizure* §

20   9.3(c), at 516 (5th ed. 2012); emphasis added).  *Rodriguez* distinguished from these appropriate

21   traffic-warrant checks inquiries that instead are "aimed at detecting evidence of ordinary criminal

22   wrongdoing."  *Id.* (brackets and internal quotation marks omitted).  The latter are outside the scope of

23   a traffic stop.  *Id.*; *see also Evans*, 786 F.3d at 786 ("ex-felon registration check" was unrelated to

24

25

26   [3] Neither Guajardo nor the government offered any breakdown of the timing of the DMV and CRIMS
     records checks.  As discussed above, at approximately 3:00 into the dashcam video, Guajardo tells
27   Lee to "check the last four; 4422," referring to the VIN.  Between approximately 3:30 and 5:00,
     Guajardo apparently is at the MDC; at approximately 5:06 he calls Lee over and reports "prior gun
28   charges and gang activity."  From the dashcam video, it thus appears that Guajardo is at the MDC for
     approximately five and a half minutes -- 3:30 to 9:00 -- of the approximately seven and a half
     minutes since his first contact with Mr. Odom.

1   traffic-stop mission).

2       In *Clark*, for example, an officer's "computerized check of the vehicle's registration based on

3   the license plate number . . . revealed the license was valid, [the driver] had a criminal record for drug

4   offenses, there were no outstanding warrants for his arrest, and the vehicle was registered to" a

5   woman with the same last name as the driver listed on the driver's license.  902 F.3d at 406.  Yet the

6   officer questioned the driver, for approximately 20 seconds, "about his criminal record."  *Id.* at 407,

7   410 n.4.  The Third Circuit affirmed the district court's suppression order because this brief criminal-

8   history questioning unconstitutionally prolonged the traffic stop.  *Id.* at 411.  Once the officer had

9   determined through a lawful records check "that Roberts was authorized to drive the vehicle, and

10  when there was no fact calling that authority into doubt," the officer's "inquiry into Roberts' criminal

11  history was . . . not tied to the traffic stop's mission."  *Id.* at 411.

12      Here, similarly, Guajardo's CRIMS criminal-history check was not a legitimate part of the

13  traffic-stop mission given the permissible DMV checks.  The DMV information the government

14  provided in discovery, which apparently was generated at the time of the traffic stop, indicates no

15  traffic convictions, no DMV actions and a failure to appear for several 2019 vehicle code violations.

16  *See* Exh. 1 to Leavitt Decl. (Bates 8-9).  This DMV record provided all the legitimate *traffic-*

17  *violation-related* information about Mr. Odom.[4]  There was no lawful reason for Guajardo then also

18  to run a CRIMS check.

19      CRIMS checks provide information about a person's prior "ordinary criminal wrongdoing."

20  *Rodriguez*, 575 U.S. at 355.  For example, a September 1, 2020, CRIMS check for Mr. Odom listed

21  felony convictions, arrest charges, booking data, court dates and sentencing information.  *See* Exh. 1

22  to Leavitt Decl. (Bates 11-14).  Seeking this type of general criminal-history-information is not

23  legitimately part of a police officer's traffic stop duties.  *See Evans*, 786 F.3d at 786 ("ex-felon

24  registration check . . . to inquire as to Evans' criminal history and confirm whether Evans was

25  registered at the address he provided," which returned information about his convictions for drug-

26  related charges was "wholly unrelated" to traffic-stop mission).  Although Guajardo's declaration

27  _____

28  [4] There is no indication that Mr. Odom had any outstanding warrant, for traffic violations or
    otherwise, at the time of the stop.

DEFENDANT'S REPLY TO MOTION TO SUPPRESS EVIDENCE
*ODOM*, CR 21–00259 JST

9

1  says he runs CRIMS checks to look for warrants as well as "probation/parole status, and other related

2  information," Guajardo Decl. ¶ 8, his particular interest in Mr. Odom's probation status is evident

3  from his prior question to Mr. Odom about whether he was on probation or parole, discussed above.

4  Moreover, it simply does not make sense for Guajardo to have run CRIMS to check for

5  outstanding warrants.  CRIMS, an Alameda-County-specific database, shows warrants only from

6  Alameda County.  Leavitt Decl. ¶ 6.  Especially given that Guajardo and Lee were CHP officers, not

7  local police, it would have made much more sense for them to check a state-wide database, such as

8  CLETS, if they really were looking for warrants.[5]  *See id.* ¶ 6 and Exh. 1 (Bates 15) (CLETS report).

9  Further undermining the government's claimed warrants-check rationale for the CRIMS check is the

10  fact that, later in the stop, the dispatcher can be heard calling two different counties to ask about

11  warrants for Mr. Odom.  Exh. 2 to Leavitt Dec. (2:45-2:46).

12  Although CRIMS offers less warrant information than CLETS, it includes significantly more

13  detail about a person's criminal history.  *Compare* Exh. 1 to Leavitt Decl. (Bates 11: September 1,

14  2020, CRIMS report for Mr. Odom) *with id.* (Bates 15:  September 1, 2020, CLETS report for Mr.

15  Odom).  Obtaining criminal-history detail -- like probation and parole status, "criminal gang activity"

16  and "firearms-related criminal history," Guajardo Decl. ¶ 7 -- likely was Guajardo's real reason for

17  prolonging the traffic stop to run a CRIMS check.  But because obtaining this non-traffic-related

18  criminal-history information is not part of the traffic-stop mission, prolonging the traffic stop to run

19  the CRIMS check violated the Fourth Amendment.

20  **C.    The government has not shown that Guajardo had reasonable suspicion to prolong the stop to run the CRIMS check**

21

22  The government does not argue the the police had reasonable suspicion at that point to prolong

23  the traffic stop by running a CRIMS check on Mr. Odom.  It thus has waived any such argument.

24  And even if it were allowed to make such an argument now, it would fail.

25  Mr. Odom pulled over promptly when the police signaled him to do so, complied with their

26  _____

27  [5] CLETS (California Law Enforcement Telecommunications System) "is an efficient law enforcement communications network available to all public agencies of law enforcement within the state."  Communications Training Officer Program Guidelines at 65, *available at*

28  https://post.ca.gov/Portals/0/Publications/CTO-Program.doc.  CLETS provides access to warrant and wanted-person information from California and nationwide.  *Id.* at 72.

commands, responded to Guajardo's questions and provided his ID card.  Although Guajardo claims Mr. Odom "appeared nervous," Guajardo Decl. ¶ 5, his voice does not sound nervous on the dashcam recording.[6]  In any case, "nervousness is a weak basis for reasonable suspicion."  *Mati*, 466 F. Supp. 3d at 1060; *see also United States v. $32,750 in U.S. Currency*, 200 F. Supp. 3d 1132, 1139-40 (D. Nev. 2016) (rejecting argument that defendant's nervousness, two recent prior drug-related arrests and travel plans established reasonable suspicion to prolong traffic stop; two recent drug-related arrests were "validly considered as part of the reasonable suspicion calculus," but because officer did not have information "that either of those arrests had resulted in a conviction, the Court accords this factor little weight in the overall analysis"; it also declined to give any weight to claimed nervousness).  This is all the more true when a sole Black man is stopped in an isolated location by two uniformed police officers.  *See United States v. Brown*, 925 F.3d 1150, 1156 (9th Cir. 2019) (acknowledging, in the context of citizen response to police contact, "the issue of race":  "There is little doubt that uneven policing may reasonably affect the reaction of certain individuals -- including those who are innocent -- to law enforcement.").  The prolongation of the stop without reasonable suspicion violated the Fourth Amendment.

**III.   The government has not carried its burden of establishing a lawful tow**

The government claims that any prolongation of the stop would not have violated the Fourth Amendment because "[o]nce Officer Guajardo learned that Odom did not have a valid driver's license, Officer Guajardo planned to have the vehicle towed."  Opp. at 7 (citing Guajardo Decl. ¶¶ 6, 11).  Guajardo's declaration establishes that he did not decide to pursue a tow of the car until at least he got the information from the DMV check showing that Mr. Odom did not have a valid license. Guajardo ¶ 6.  His decision to tow thus was the fruit of his unconstitutional prolongation of the stop at least to ask Mr. Odom about his probation and parole status, if not to run the CRIMS check.

**A.   The government has not carried its burden of showing that the inventory search and tow of the car were constitutional**

The government has not carried its burden of establishing that the tow and inventory search of

---

[6] If anyone was demonstrably nervous during the stop, it was Guajardo; while he was running checks in the police car, he startled and said, "Oooh uh . . . scared the crap out of me."  Dashcam 6:00.

1    the car came within an exception to the Fourth Amendment's warrant requirement.  A tow is

2    permissible, according to Guajardo, "when I issue a ticket for driving without a license."  *Id.* (citing

3    Cal. Veh. Code § 22651(p)).  That statutory provision provides that an officer "may remove a vehicle

4    . . . [i]f the peace officer issues the driver of a vehicle a notice to appear for a violation of Section

5    12500 . . . ."  Cal. Veh. Code § 22651(p); *see* Guajardo Decl. ¶ 6 (citing Cal. Veh. Code § 12500(a)

6    (person may not drive without a valid driver's license)).  But Guajardo *did not cite* Mr. Odom for

7    violating California Vehicle Code section 12500.  *See* Exh. 1 to Leavitt Decl. (Bates 10) (probable

8    cause statement listing only penal code violations); *id.* (Bates 11-12) (Alameda County Criminal

9    Events, same); *id.* (Bates 17-18) (rap sheet, same); *id.* (Bates 19) (police report, same).  Thus, the

10   necessary predicate for Guajardo's reliance on California Vehicle Code section 22651(p) to justify

11   the tow is missing.

12       Beyond that, it is not enough for the government to cite a state statute that allows police to tow

13   a vehicle.  *United States v. Maffei*, 417 F. Supp. 3d 1212, 1228 (N.D. Cal. 2019), *aff'd on other*

14   *grounds*, 827 F. App'x 760 (9th Cir. 2020).  "[T]he decision to impound pursuant to the authority of a

15   city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure

16   under the Fourth Amendment."  *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005).

17   Nor is probable cause to believe the driver committed a traffic violation sufficient to justify a tow and

18   inventory search.  *United States v. Cervantes*, 703 F.3d 1135, 1141-42 (9th Cir. 2012).  Neither

19   Guajardo nor the government has offered any further justification for the tow in this case.

20       Police may tow and search a vehicle without a warrant under the "community caretaking"

21   doctrine only if they do so (1) "in conformance with the standardized procedures of the local police

22   department" and (2) "in furtherance of a community caretaking purpose, such as promoting public

23   safety or the efficient flow of traffic."  *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016)

24   (internal quotation marks omitted).  "This requirement ensures that impoundments are conducted on

25   the basis of something other than suspicion of evidence of criminal activity."  *Id.* (internal quotation

26   marks omitted).

27       Neither Guajardo nor the government has identified any CHP "standardized procedures" that

28   authorize, let alone require, tows and inventory searches.  Nor have they identified any "community

1   caretaking purpose" for the tow.  The car was parked on the shoulder of the road.  Exh. 1 to Leavitt

2   Decl. (Bates 23).  There is no indication that the officers made any effort to contact the registered

3   owner of the car.  *See id.* (Bates 19) (noting registered owner's name and address).  The Ninth Circuit

4   has held that an inventory search was "unconstitutional -- even though the driver was driving on a

5   suspended license -- because the government presented no evidence that the impoundment served a

6   caretaking function."  *Cervantes*, 703 F.3d at 1141 (discussing *United States v. Caseres*, 533 F.3d

7   1064, 1075 (9th Cir. 2008)); *see also Maffei*, 417 F. Supp. 3d at 1229 (rejecting government's asserts

8   community-caretaking justifications).  The government here has not carried its burden of establishing

9   that the tow and inventory search were constitutional.  *Cervantes*, 703 F.3d at 1140-41.

> **B.    The record establishes that the tow and inventory search were unconstitutionally pretextual**

12  Police may not conduct an inventory search as a pretext for uncovering evidence of criminal

13  activity.  *Cervantes*, 703 F.3d at 1141.  In determining whether an inventory search is valid, the

14  searching officer's "actual motivations *do* matter."  *United States v. Johnson*, 889 F.3d 1120, 1125

15  (9th Cir. 2018) (emphasis in original; internal quotation marks omitted).  "Thus, an administrative

16  search may be invalid where the officer's subjective purpose was to find evidence of crime."  *Id.* at

17  1126 (internal quotation marks omitted).  In *Johnson*, for example, the officers' statements that they

18  searched the car "specifically to gather evidence of a suspected crime (and not to further . . .

19  permissible caretaking motives) are sufficient to conclude that the warrantless search of the car was

20  unreasonable."  *Id.* at 1128 (ellipses added).

21  The record here similarly shows that Guajardo searched the car not for any permissible

22  caretaking motive but to look for evidence of criminal activity after learning of Mr. Odom's criminal

23  history from his (unconstitutional) CRIMS check.  Guajardo did not then and does not now identify

24  any caretaking purpose for the tow.  *See United States v. Turnbow*, 2019 WL 654456, at **6-7 (D.

25  Nev. 2019) (unpublished) (in granting suppression because police conducted purported inventory

26  search for impermissible pretextual purpose of looking for evidence, considering, *i.a.*, that police

27  report did not discuss any caretaking motivation for search).  On the contrary, he repeatedly referred

28  to the results of the CRIMS check when he talked about needing to search the car.  For example,

1   Guajardo said, "Yeah, I can tell you he was nervous up front.  I ran him out and he had prior gun

2   charges and I was like all right I'm a -- I got to get in this car."  Dashcam 22:25.  Talking to Mr.

3   Odom, he said, "I looked you up, you had prior gun charges, that's why I pulled you out."  *Id.* 27:50.

4   Guajardo also referred to the "prior gun charges and gang activity" when he first said he was going to

5   "get in the car."  *Id.* 5:20; *see also id.* at 17:20 (saying on the phone that "he's 205 and I ran him out

6   on CRIMS and pulled him out of the car and he had a gun in his waistband.  He's got two [apparently

7   referring to two prior gun charges].").

8       The government did not carry its burden of establishing that the warrantless search and tow of

9   the car came within an exception to the Fourth Amendment's warrant requirement.  Because they

10  were unconstitutional, the government cannot rely on them to justify the prolongation of the stop or

11  the need to pat-search Mr. Odom.  *See* Opp. at 8 (citing need to tow of the car as justification for

12  duration of stop and for removing from car and pat-searching Mr. Odom); *id.* at 11 (arguing that

13  "mission and duration" of stop "were not complete at the time of pat-down" because "Officer

14  Guajardo planned to tow his vehicle.").

15  **IV.   The government has not shown that the pat-search of Mr. Odom was constitutional**

16      Guajardo pat-searched Mr. Odom because he "planned to have the vehicle towed after the

17  completion of the stop."  Guajardo Decl. ¶ 11.  To justify the pat-search, he claims to have had

18  reasonable suspicion that Mr. Odom "may have been armed and dangerous" based on, among other

19  things, "his criminal history."  *Id.*  The government also relies on the tow and the CRIMS information

20  to justify the pat-search.  Opp. at 8.  As discussed above, both the CRIMS check and the tow violated

21  the Fourth Amendment.  If the Court agrees that either one did, the pat-search of Mr. Odom also was

22  unlawful as the fruit of those constitutional violations.

23      Even if the Court were to find that the government carried its burden of establishing that both

24  the CRIMS check and the tow comported with the Fourth Amendment, however, it still must find that

25  the government did not carry its burden of justifying the warrantless pat-search.

26      "[W]hen an officer is justified in believing that the individual whose suspicious behavior he is

27  investigating at close range is armed and presently dangerous to the officer or to others, the officer

28  may conduct a patdown search to determine whether the person is in fact carrying a weapon."  *Minn.*

1    *v. Dickerson*, 508 U.S. 366, 373 (1993) (brackets modified and internal quotation marks omitted).

2    An officer's suspicion or hunch is not enough.  *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016).

3    Nor is it enough for the government to show "circumstances suggesting only that a suspect would be

4    dangerous *if* armed."  *Id.* (emphasis in original).  "There must be adequate reason to believe the

5    suspect *is* armed."  *Id.* (emphasis in original).  "The purpose of this limited search is not to discover

6    evidence of crime, but to allow the officer to pursue his investigation without fear of violence."

7    *Dickerson*, 508 U.S. at 373 (internal quotation marks omitted).

8         The government acknowledges its burden to establish reasonable suspicion that Mr. Odom was

9    at the time armed and dangerous.  Opp. at 8.  It has failed to carry this burden.

10        In this case, two armed police officers were dealing with a single car occupant.   Exh. 1 to

11   Leavitt Decl. (Bates 23)  The traffic violations that Guajardo was investigating (speeding and driving

12   without a valid license) were not the type of criminal activity that suggests danger or weapon

13   possession.  *See Thomas*, 818 F.3d at 878 ("the type of crime a person is suspected of committing

14   may be highly relevant to the existence of reasonable suspicion for a weapons frisk").

15        Significantly, Mr. Odom responded to and complied with all Guajardo's commands and

16   directions.  *See* Exh. 1 to Leavitt Decl (Bates 23-24: Mr. Odom "immediately slowed down and

17   yielded"; told Guajardo did not have have a license, insurance or registration but provided his true

18   California identification card; "immediately turned around" and complied with second command to

19   put his hands behind his head).  Courts have held that police lacked reasonable suspicion to pat-

20   search people who acted in a "compliant and non-threatening manner."  *See, e.g., Ramirez v. City of

21   Buena Park,* 560 F.3d 1012, 1022 (9th Cir. 2009) (holding that officer did not have reasonable

22   suspicion for pat-search where he merely referred to officer safety and person was cooperative and

23   compliant with officer's requests); *United States v. I.E.V.*, 705 F.3d 430, 435 (9th Cir. 2012) (holding

24   that police lacked reasonable suspicion to pat-search defendant based on suspicion of drug activity

25   where he "acted in a compliant and nonthreatening manner"); *Murillo v. City of Woodland*, 2011 WL

26   3028543, at *15 (E.D. Cal. 2011) (unpublished) (rejecting general assertions about officer safety to

27   justify pat-search where driver "was cooperative and responsive to [officer's] requests").

28        Moreover, the officers left Mr. Odom alone in the car *for approximately six minutes* before

1   directing him to get out of the car and pat-searching him.  Dashcam 3:00-9:00.  "The fact that an

2   officer had already completed a large portion of his investigation of the vehicle without facing any

3   threatening behavior undermines the well-settled purpose of a *Terry* stop to allow the officer to

4   pursue his investigation without fear of violence." *I.E.V.*, 705 F.3d at 438 (considering that officers

5   "did not have the required 'immediate' need to protect themselves or others from danger"; ellipses

6   and internal quotation marks omitted).

7          In light of these facts, the government's asserted justifications for the pat-search cannot satisfy

8   its burden.  Neither it being a traffic stop nor it being night can provide the necessary reasonable

9   suspicion that Mr. Odom was then armed and dangerous.  *See* Opp. at 8-10 (discussing justification).

10  "Importantly, reasonable suspicion must be individualized." *Thomas*, 818 F.3d at 877; *see also*

11  *Arizona v. Johnson*, 555 U.S. 323, 330-32 (2009) (discussing armed-and-dangerous requirement for

12  pat-searches during traffic stops).  "[G]eneralized concerns about officer safety, the time of night at

13  which the traffic stop occurred, and the lighting the area" are insufficient to justify a pat search for

14  weapons during a traffic stop.[7]  *Murillo*, 2011 WL 3028543, at \*\*14-15.

15         Mr. Odom's alleged nervousness, Opp. at 9, and "shifting and moving around in the vehicle,"

16  Guajardo Decl. ¶ 5, do not give rise to reasonable suspicion.[8]  *See Thomas*, 818 F.3d at 884 (rejecting

17  argument that defendant's appearing "startled and fidgety" "support even minimally the inference

18  _____

19  [7] The cases cited by the government about night pat-searches, Opp. at 9, rely on substantially more
    facts indicating danger and at least the possible presence of a weapon.  In *United States v. Mattarolo*,
20  209 F.3d 1153, 1155-58 (9th Cir. 2000), an experienced officer had reason to believe that the person
    he contacted who had a crate in his pickup at the gate of a closed, fenced construction area late at
21  night might be "a suspect caught possibly in the act of committing a nighttime burglary and therefore
    more likely to be armed."  And in *United States v. Garner*, 152 F. App'x 612 (9th Cir. 2005)
22  (unpublished), the officer not only knew that the person he contacted during the "early morning hours
    in a high-crime area" had a prior police contact involving carrying a concealed weapon and a
23  confirmed arrest for carrying a concealed weapon but also had present "reasonable suspicion that he
    might have committed vehicle theft, a serious crime in which the perpetrator could well be armed."
24

25  [8] The cases cited by the government about nervousness, Opp. at 9, also are distinguishable.  In *United
    States v. Brown*, 996 F.3d 998, 1007-08 (9th Cir. 2021), a defendant who the police reasonably
26  suspected was engaged in drug trafficking, which itself supported reasonable suspicion he might be
    armed, reached a finger into his pocket, which "had reasonably given the officer some concern."  In
27  *United States v. Taylor*, 716 F.2d 701, 708-09 (9th Cir. 1983), police had reasonable suspicion that
    the defendant was involved in manufacturing amphetamines, he twice disobeyed orders to raise his
28  hands and made furtive movements where officer could not see his hands; in addition, the number of
    suspects at least matched the number of officers present.

1   that [he] was armed"); *I.E.V.*, 705 F.3d at 438 (rejecting "nervous or fidgety conduct" as establishing

2   reasonable suspicion for pat-search).  After the pat-search, Guajardo referred to Mr. Odom being

3   nervous, but only in the context of his hunch that "there was something wrong."  Dashcam 11:05; *see*

4   *also id.* 23:15 ("It just felt weird.  I knew there was something wrong.  Yeah, it was weird.").  That

5   the officers left him alone in the car for *six minutes* after allegedly observing his allegedly suspicious

6   allegedly nervous behavior undermines the government's claim that anything that occurred before the

7   CRIMS check raised suspicions that he was armed or dangerous.

8         The government fares no better with its effort to justify the pat-search based on its claim that

9   Mr. Odom gave Guajardo information "that was inconsistent with the information ascertained from

10  the DMV records check of the vehicle."  Opp. at 9 (citing Guajardo Decl. ¶ 7).  As discussed in the

11  Facts section, above, although Guajardo's declaration and police report say that Mr. Odom told him

12  "that the vehicle belonged to his sister who lived up the street from where the vehicle was currently

13  stopped," Guajardo Decl. ¶ 5; Leavitt Decl. (Bates 23), the dashcam shows that Mr. Odom actually

14  told Guajardo that it was his *sister's* car and that *his* home was "right up the street."  Dashcam at

15  1:36-2:36.  The claimed inconsistency did not exist.

16        Finally, police may not rely solely on a person's prior criminal history to establish reasonable

17  suspicion.  *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (en banc); *accord Burrell v.*

18  *McIlroy*, 464 F.3d 853, 858 n.3 (9th Cir. 2006).  In *United States v. Perez*, 603 F. App'x 620, 621-22

19  (9th Cir. 2015) (unpublished), which the government cites, Opp. at 9, agents trained and experienced

20  in smuggling interdiction, who observed a car driving on a "known smuggling route" in an

21  "abnormal" way that "appeared to be an attempt to evade contact with the agents," properly

22  considered information that the car's registered owner had previously been arrested for alien

23  smuggling and "possibly involved in a [separate] smuggling-related seizure" in finding reasonable

24  suspicion for a border traffic stop.  Here, by contrast, an inexperienced officer made a routine traffic

25  stop for speeding and then discovered the driver did not have a valid license.  The information from

26  the officer's (unlawful) criminal records check did not corroborate the basis for the stop, as the

27  criminal-history information did in *Perez*.

28        As discussed in the Facts section, above, neither Guajardo's police report nor his probable

DEFENDANT'S REPLY TO MOTION TO SUPPRESS EVIDENCE
*ODOM*, CR 21–00259 JST

17

1   cause statement nor his declaration makes clear what exactly he learned about Odom's criminal

2   history.  In none of these documents did he indicate that he knew whether the gang and gun activity

3   involved police contacts, arrests or convictions.  None of these documents indicate what Guajardo

4   learned from his (unlawful) CRIMS check about how recent this activity was.  And there is no

5   indication that anything Guajardo observed during the eight minutes of the officers' pre-pat-search

6   contact with Mr. Odom that night suggested that he was armed or dangerous.  Even considering the

7   CRIMS information, the government has not carried its burden of establishing that Guajardo had the

8   necessary reasonable suspicion that Mr. Odom was *at that time* armed *and* a danger to the officers.[9]

9   **V.    The government has not established any exception to the exclusionary rule**

10          The government suggests some kind of free-floating deterrence inquiry that would allow it to

11   avoid the "typical remedy" of suppression for the Fourth Amendment violations in this case.  Opp. at

12   10; *Ngumezi*, 980 F.3d at 1291.  It has not cited any authority to support its argument that the Court

13   should or even may refuse to apply the exclusionary rule without the government carrying its burden

14   of establishing an exception to that rule.  *See, e.g., Utah v. Strieff,* 136 S. Ct. 2056, 2061 (2016)

15   (discussing exceptions to exclusionary rule and applying attenuation exception).  This Court and the

16   Ninth Circuit have repeatedly rejected such arguments.  *See, e.g.*, *Ngumezi*, 980 F.3d at 1291; *Maffei*,

17   417 F. Supp. 3d at 1231 n.31; *Ward*, 2017 WL 1549474, at*4.

18          "[A]lthough the flagrancy of the government's conduct is relevant to the attenuation doctrine, .

19   . . lack of flagrancy is not a freestanding basis for avoiding the application of the exclusionary rule --

20   ─────────────────────

21   [9] The government states, in a footnote, without any citation to any authority, that driving without a
22   license is an arrestable offense for which Guajardo "could've legally arrested Odom and searched
     Odom incident to the arrest."  Opp. at 10 n.9.  But this is not what happened.  In fact, as discussed in
23   Section III.A., above, Guajardo did not even *cite* Mr. Odom for driving without a license, let alone
     arrest him.

24          Absent an arrest, police cannot search incident to arrest.  *See Menotti v. City of Seattle*, 409
     F.3d 1113, 1153 (9th Cir. 2005) (holding that, although officer had probable cause to arrest, because
25   he did not arrest, he could not lawfully have searched incident to arrest; "We decline to extend the
     doctrine of 'search incident to arrest' to give protection for a warrantless search or seizure when no
26   arrest is made."); *cf. Thornton v. United States*, 541 U.S. 615, 621 (2004) ("An officer may search a
     suspect's vehicle [incident to arrest] only if the suspect is arrested."); *Knowles v. Iowa*, 525 U.S. 113
27   (1998) (holding that car search was not constitutional search incident to arrest where police issued
     citation for speeding even though they could have arrested driver).

28          Moreover, while preparing to pat-search Mr. Odom, Guajardo twice assured him, "You're not
     under arrest."  Dashcam 9:04.  The government has not provided any factual or legal support for this
     counterfactual justification for the warrantless search of Mr. Odom.

DEFENDANT'S REPLY TO MOTION TO SUPPRESS EVIDENCE
*ODOM*, CR 21–00259 JST

1    at least not where, as here, it falls short of establishing that the officer had an objectively reasonable

2    good-faith belief in the lawfulness of his conduct." *Ngumezi*, 980 F.3d at 1291. "[T]he Ninth Circuit

3    has interpreted the good-faith exception as limited to police conduct specifically authorized by

4    binding precedent." *United States v. Cornejo*, 196 F. Supp. 3d 1137, 1149 (E.D. Cal. 2016)

5    (brackets, emphasis and internal quotation marks omitted). The government here has not pointed to

6    any "binding precedent that is later overruled" on which Guajardo relied. *Davis v. United States*, 564

7    U.S. 229, 232 (2011).

8        "The Supreme Court has never applied the good faith exception to excuse an officer who was

9    negligent himself, and whose negligence directly led to the violation of the Defendant's constitutional

10    rights." *United States v. Camou*, 773 F.3d 932, 945 (9th Cir. 2014) (distinguishing and rejecting

11    application of *Herring v. United States*, 555 U.S. 135 (2009)). Indeed, *Herring* itself acknowledged

12    that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in

13    some instances recurring or systemic negligence." 555 U.S. at 144. Courts thus continue to suppress

14    evidence that the police discover "through conduct that . . . is plainly unconstitutional, in contrast to

15    the kind of 'isolated negligence' at issue in *Herring*. That misconduct is sufficiently deliberate that it

16    can be deterred through exclusion of the fruit of the illegal search, and sufficiently culpable to

17    warrant imposition of that sanction." *United States v. Artis*, 919 F.3d 1123, 1134 (9th Cir. 2019).

18        The Ninth Circuit has ordered or affirmed suppression as an appropriate remedy for

19    unconstitutional prolonged seizures,[10] unconstitutional vehicle impoundments and inventory

20    searches[11] and unconstitutional pat-searches.[12] "[W]hile it is true that applying the exclusionary rule

21    in this case will mean that a guilty defendant goes free, that is true of applying the exclusionary rule

22    in essentially every case." *Ngumezi*, 980 F.3d at 1291. The government has not shown any

23    applicable exception to the exclusionary rule. Suppression is the necessary and appropriate remedy.

24

25

26

27    [10] *See, e.g.*, *Landeros*, 913 F.3d at 870; *Gorman*, 859 F.3d at 17-19.

    [11] *See, e.g.*, *Cervantes*, 703 F.3d at 1143; *Caseres*, 533 F.3d at 1076.

28    [12] *See, e.g.*, *I.E.V.*, 705 F.3d at 433.

DEFENDANT'S REPLY TO MOTION TO SUPPRESS EVIDENCE
*ODOM*, CR 21–00259 JST

**CONCLUSION**

Mr. Odom agrees with the government that an evidentiary hearing is not necessary in this case. Opp. at 11.  For the reasons stated herein, the government has not carried its burden of establishing that the warrantless and prolonged seizure and the warrantless search of Mr. Odom did not violate the Fourth Amendment.  All fruits of the unconstitutional conduct must be suppressed.

Dated:      November 19, 2021                              Respectfully submitted,

                                                           GEOFFREY HANSEN
                                                           Acting Federal Public Defender
                                                           Northern District of California

                                                                          /S
                                                           JOYCE LEAVITT
                                                           Assistant Federal Public Defender