UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CAMERON ANTHONY ODOM,<br><br>Defendant. | Case No. 21-cr-00259-JST-1<br><br>**ORDER GRANTING MOTION TO SUPPRESS EVIDENCE**<br><br>Re: ECF No. 34 |

Before the Court is Defendant Cameron Anthony Odom's motion to suppress the gun and ammunition found on Odom's person pursuant to a warrantless search and seizure. ECF No. 34. The Court will grant the motion.

I. **BACKGROUND**[1]

On August 26, 2020, at approximately 2:32 AM, Odom drove past two California Highway Patrol officers at 92 miles per hour, in violation of California law. ECF No. 1 at 5. The officers followed the vehicle and instructed Odom to stop, roll down the windows, and turn off the car. He complied immediately. Dashcam 1:04-1:12. After the car stopped, Officer Guajardo approached the passenger-side window and Officer Lee approached the driver's side. *Id.* at 1:32-1:42. Officer Guajardo told Odom that he was speeding and asked for his license, insurance, and registration. ECF No. 1 at 5. Odom explained that he did not have any of those items, and his license was suspended, but provided Officer Guajardo with a California Identification card. *Id.* According to Officer Guajardo, Odom "was shifting and moving around in the vehicle" and

---

[1] In writing the background section, the Court relies on the affidavit of Special Agent Christopher Bailey, ECF No. 1, as well as declarations and recordings submitted by both parties. Although most facts are uncontested, the Court notes the inconsistencies that are material to the Court's reasoning.

"appeared nervous." ECF No. 39-1 ¶ 5. Odom explained that the car belonged to his sister. Dashcam 2:22. A few seconds later, Officer Guajardo asked "How far are you from home?" *Id.* at 2:19, and Odom replied that it was "literally right up the street." *Id.* at 2:21. When asked whether he was on probation or parole, Odom said he was not. ECF No. 39-1 ¶ 5.

The officers then conducted a DMV records check and a Criminal Records Information Management System (CRIM) check. The parties dispute whether Officer Guajardo ran both checks himself or whether he requested help from dispatch.[2] Based on the DMV records check, Officer Guajardo learned that Odom's license was withheld for failure to appear. From the CRIMS record check, Officer Guajardo learned "that Odom had affiliations with criminal gang activity and that Odom had firearms-related criminal history." *Id.* ¶ 7.

Because Odom did not have a valid license, Officer Guajardo "planned to have the vehicle towed after the completion of the stop." *Id.* ¶ 11. Officer Guajardo asked Odom to step out of the vehicle, conducted a pat-down search, and felt a firearm near Odom's waistband. *Id.* Officer Guajardo removed the firearm, which contained one round of ammunition in the chamber, placed Odom in handcuffs, and then recovered 19 rounds of ammunition from Odom's person. *Id.* Officer Guajardo then placed Odom under arrest pursuant to 18 U.S.C. § 922(g)(1). ECF Nos. 1 at 1; 39-1 ¶ 11. "The National Integrated Ballistic Information Network (NIBIN) later revealed that the rounds in the firearm and magazine matched shell casings previously collected at the scene of a shooting in Oakland, CA on May of 2020." ECF No. 39 at 7.

Odom now moves to suppress the gun and ammunition found during the search because (1) Officer Guajardo unconstitutionally prolonged the stop by asking about Odom's probation and parole status; (2) Officer Guajardo unconstitutionally prolonged the stop by running a CRIMS check on Mr. Odom; (3) the Government has not carried its burden of establishing that towing the

---

[2] *Compare* ECF No. 39-1 ¶ 6 ("I requested dispatch run a DMV records check of the vehicle and Odom while I did an Alameda Criminal Records Information Management System (CRIMS) records check form the patrol vehicle"); ECF No. 39 at 12 ("[S]ince the verification of Odom's PRCS status occurred simultaneously to the outstanding warrants check, Officer Guajardo did not extend the stop by any measurable amount of time."); *with* ECF No. 42 at 13 (noting that Officer Guajardo's "sworn probable-cause declaration, supported by the other evidence provided by the government in discovery . . . states '*I conducted a DMV records check* using my Mobile Digital Computer.'"); ECF No. 43-1 at 7.

2

car was lawful; (4) the Government has not shown that the pat-search was constitutional; and (5) the Government has not established any exception to the exclusionary rule. ECF Nos. 34; 42. The Government opposes the motion. ECF No. 39.

## II.     LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." When determining whether someone's Fourth Amendment rights have been violated, "the ultimate touchstone . . . is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted). Even when an initial seizure is based on probable cause, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citation omitted). For example, courts have found that a traffic stop may "become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission." *Id.* In the context of a traffic stop, the mission is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citation omitted). Thus, a traffic stop becomes unlawful when officers engage in unrelated actions that "measurably extend the duration of the stop," *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), unless these actions are supported by independent reasonable suspicion. *United States v. Landeros*, 913 F.3d 862, 867-68 (9th Cir. 2019) (citation omitted). "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Landeros*, 913 F.3d at 868 (internal quotations and citation omitted) (emphasis in original).

The government bears the burden of demonstrating that a warrantless search or seizure does not violate the Fourth Amendment. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). If the government fails to meet its burden, all fruits of the violation must be suppressed. *Id.* at 1143.

### III. DISCUSSION

#### A. The CRIMS Record Check

If the CRIMS check was within the scope of Officer Guajardo's traffic-stop mission, then it did not violate the Fourth Amendment.[3] Odom argues that the CRIMS check was unrelated to the traffic-stop mission because it "provide[s] information about a person's prior 'ordinary criminal wrongdoing.'" ECF No. 42 at 14. The Government disagrees, explaining that because the CRIMS check includes warrant information, the search was proper. ECF No. 39 at 9.

The Supreme Court has determined that "an officer's mission includes . . . checking the driver's license, determining whether there are *outstanding warrants* against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355 (internal quotations and citation omitted) (emphasis added). The Court in *Rodriguez* distinguished these activities from dog sniffs which are "aimed at detecting evidence of ordinary criminal wrongdoing" and therefore outside the scope of a traffic stop. *Id.* (cleaned up). In dissent, Justice Thomas noted that warrant checks "look more like they are directed to 'detecting evidence of ordinary criminal wrongdoing' than to 'ensuring that vehicles on the road are operated safely and responsibly.'" *Id.* at 363-64 (citation omitted). Thus, Justice Thomas concluded, there is no logical reason why courts should create an "artificial line" between warrant checks and dog sniffs. *Id.* at 364.

In some ways, Odom's argument reflects Justice Thomas's concern in *Rodriguez*. Odom asks this Court to distinguish between traffic-warrant checks "aimed at detecting evidence of ordinary criminal wrongdoing" and traffic-warrant checks that "make[] it possible to determine whether the apparent traffic violator is wanted for one or more previous *traffic* offenses." ECF No. 42 at 13 (emphasis in original). But neither the *Rodriguez* majority, nor any other authority the Court has found, make such a distinction. Instead, the majority in *Rodriguez* noted that a "warrant check makes it possible to determine whether the apparent traffic violator is wanted for

---

[3] The Court does not examine the propriety of the initial stop because the parties do not dispute its validity. *See* ECF No. 34 at 2 ("According to the criminal complaint in this case, CHP officers conducted a traffic stop of the car Mr. Odom was driving because it was speeding.").

4

1    one or more previous traffic offenses." *Rodriguez*, 575 U.S. at 355 (quoting 4 W. LaFave, Search

2    and Seizure § 9.3(c), p. 516 (5th ed. 2012)).  The Court did not hold that a warrant check must be

3    limited in scope to reveal *only* information regarding traffic offenses.

4        Odom argues that Officer Guajardo should not have run a CRIMS search because the

5    DMV records search generated information regarding traffic convictions, DMV actions, and

6    vehicle code violations.  ECF No. 42 at 14.  There is no indication in the record that Officer

7    Guajardo could have determined whether there were outstanding warrants from the DMV records

8    search alone.  In fact, according to the DMV website, "[y]our driver license or motor vehicle

9    agency *doesn't provide information regarding checking or searching for warrants*."[4]  Indeed,

10   Odom's DMV record does not include a section regarding outstanding warrants.  ECF No. 43-1 at

11   5-6.  Finally, Odom apparently concedes that the DMV search does not provide sufficient warrant

12   information when he argues that Officer Guajardo should have run a state-wide warrant search

13   instead of using a county-specific database.[5]  ECF No. 42 at 15.  Because the record does not

14   show that a DMV search provides sufficient information regarding the existence of a driver's

15   outstanding warrants, the Court cannot find that the CRIMS search performed by Officer Guajardo

16   was outside the scope of the traffic stop.

17       The records search in this case is distinguishable from *United States v. Evans*, 786 F.3d

18   779, 786 (9th Cir. 2015), where the Ninth Circuit found that an ex-felon registration check which

19   returned information about convictions for drug-related charges was "wholly unrelated" to the

20   traffic-stop mission.  A CRIMS check, as Odom concedes, "shows warrants . . . from Alameda

21   County" as well as general criminal information.  ECF No. 42 at 15.  Thus, the CRIMS search was

22   not

23   "wholly unrelated" to the traffic-stop mission because it "ma[de] it possible to determine whether

---

[4] *Warrant*, DMV.org, https://www.dmv.org/warrants.php (last visited Dec. 10, 2021).

[5] Odom argues that it would have made more sense for Officer Guajarado to search a state-wide database, such as CLETS, for warrants, instead of a database that only gathers information about warrants from Alameda County.  ECF No. 42 at 15.  Odom argues that this failure demonstrates that Officer Guajardo was really looking for general criminal information, not traffic-related warrants.  *Id.*  But Odom cites no case establishing that a court should consider an officer's "real reason" for running a records search.  Odom also cites no authority that an officer must use a state-wide database over a county-specific database when searching for outstanding warrants.

[Odom was] wanted for one or more previous traffic offenses." *Rodriguez*, 575 U.S. at 355 (quoting LaFave, Search and Seizure § 9.3(c), at 516).

### B.     The Probation Inquiry

#### 1.     Fourth Amendment Violation

This Court has already held that questions relating to probation and parole are "wholly unrelated to [an officer's] mission of 'ensuring that vehicles on the road are operated safely and responsibly.'" *United States v. Ward*, No. 16-cr-00485-JST-1, 2017 WL 1549474, at *3 (N.D. Cal. May 1, 2017) (quoting *Evans*, 786 F.3d at 786 (quoting *Rodriguez*, 575 U.S. at 355)). Therefore, there is no need to consider anew whether the probation inquiry was within the scope of the traffic-related stop. It was not.

The remaining question, then, is whether Officer Guajardo impermissibly prolonged the traffic stop when he asked Odom if he was on probation or parole. ECF No. 42 at 9 (citing ECF No. 39-1 ¶ 5). The Government argues that this question did not prolong the stop because it "occurred approximately two minutes into the stop and before the stop was completed or could be reasonably completed." ECF No. 39 at 13. Odom disagrees. First, he points out that the Court must focus on whether the questioning added time to the stop, not the chronology of the inquiry. ECF No. 42 at 11. Second, he claims that the Fourth Amendment does not tolerate adding "any time to the stop," even if "the time added was relatively short." *Id.* at 10-11. Because the question regarding probation status added time to the stop, Odom argues that this conduct violated the Fourth Amendment.

At the outset, the Court agrees with Odom that "what matter[s] [i]s the added time, not at what point, in the chronology of the stop, that time was added." *Landeros*, 913 F.3d at 866 (citing *Rodriguez*, 575 U.S. at 357-58). Instead, the important consideration is whether Officer Guajardo's brief question regarding probation status violated the Fourth Amendment by adding a few seconds to the traffic stop. Ninth Circuit precedent suggests that an unrelated inquiry that adds *any* amount of time to a traffic stop is sufficient to violate the Fourth Amendment. In *Landeros*, for example, the Ninth Circuit overturned a prior case that "permits slight prolongations to ask unrelated questions" because it conflicted with *Rodriguez,* which "requires independent,

6

reasonable suspicion if the additional investigation adds *any time* to a traffic stop." 913 F.3d at 867 (cleaned up) (emphasis added). Although in *Landeros* the stop was prolonged by a few minutes, not a few seconds, the rule articulated in the case does not make a time-based distinction. *See id.* The concept that unrelated inquiries that add even a few seconds to a traffic stop may violate the Fourth Amendment also finds support in out-of-circuit and out-of-district cases. *See, e.g.*, *United States v. Clark*, 902 F.3d 404, 410 n.4 (3d Cir. 2018) ("The Government's argument that the brevity (20 seconds) of the criminal history questioning does not support it being off-mission also fails given the Supreme Court's explicit rejection of a *de minimis* exception in *Rodriguez*."); *United States v. McCowan*, No. 2:20-cr-00151-JAD-EJY, 2021 WL 2827292, at *5 (D. Nev. July 7, 2021) ("Because Turley's questioning of the passengers after he obtained McCowan's driver's license added 40 seconds to this stop, which is a measurable length of time, the seizure was unlawful under *Rodriguez* and its Ninth Circuit progeny."). Because the Government does not argue that the probation inquiry was supported by reasonable suspicion, the Court finds that the probation inquiry violated the Fourth Amendment.

### 2. Exclusionary Rule

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted). However, the exclusionary rule is limited by the "well-established principle" that "evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Id.* at 815; *see also United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) ("The exclusionary rule requires a causal connection between the illegal conduct and the evidence sought to be suppressed.").

In this case, nothing suggests that "the gun is in some sense the product of" the probation inquiry. *United States v. Pulliam*, 405 F.3d 782, 787 (9th Cir. 2005). The Government argues that Officer Guajardo removed Odom in order to effectuate a tow and frisked him due to a reasonable fear of safety. Defendant contends that Officer Guajardo likely removed Odom due to the discovery of Odom's prior convictions. But nothing in the briefs, declarations, or dashcam

7

footage suggests that the probation inquiry led to the CRIMS search, the decision to remove Odom from the vehicle, or the frisk. Because there is no reason to think that the probation inquiry "enabled [Officer Guajardo] to find evidence . . . that otherwise would have remained hidden," *see id.*, the Court cannot apply the exclusionary rule.

### 3. The Tow

The Government states that Officer Guajardo asked Odom to step out of the car to effectuate a lawful tow of the vehicle. Odom argues that because the Government has not justified the warrantless tow under the "community caretaking" doctrine, any evidence collected as a result of the tow must be suppressed.

To justify a warrantless search and seizure, the government bears the heavy burden of showing that an exception to the Fourth Amendment warrant requirement applies. *Cervantes*, 703 F.3d at 1141, 1142 n.1. "Under the community caretaking exception, 'police officers may impound vehicles that jeopardize public safety and the efficient movement of vehicular traffic.'" *Id.* at 1141 (quoting *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005) (internal quotation marks omitted)). "Whether an impoundment is warranted under the community caretaking doctrine depends on the location of the vehicle and the police officer's duty to prevent it from creating a hazard to other drivers or from being a target for vandalism or theft." *United States v. Caseres*, 533 F.3d 1064, 1075 (9th Cir. 2008); *see also United States v. Beck*, No. 2:12-cr-00362-APG-PAL, 2015 WL 74125, at *15 (D. Nev. Jan. 6, 2015) ("An officer cannot reasonably order an impoundment in situations where the location of the vehicle does not create any need for the police to protect the vehicle or to avoid a hazard to other drivers.").

The Government does not argue that Officer Guajardo's decision to tow Odom's vehicle without a warrant was justified by a Fourth Amendment exception. It only argues that the tow was lawful under a section of the California Vehicle Code. *See* ECF No. 39 at 7. But the question "is not whether the search (or seizure) was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment." *Sibron v. New York*, 392 U.S. 40, 61 (1968) (quotations and citation omitted).

The Government has not established that the community caretaking exception applies

8

because there are no allegations that Odom's vehicle "was parked illegally, posed a safety hazard, or was vulnerable to vandalism or theft." *Cervantes*, 703 F.3d at 1141; *see also Gonzalez-Tzita v. City of Los Angeles*, No. CV 16-194-GHK (Ex), 2016 WL 11518619, at *4 (C.D. Cal May 3, 2016) (same). The fact that Odom failed to provide a license, registration, or proof of insurance is not sufficient to justify a search under the community caretaking exception. *See Beck*, 2015 WL 74125, at *15 (finding that the government failed to meet its burden under the community caretaking exception even though the vehicle did not display a valid license plate and the defendant failed to provide his driver's license and proof of insurance registration).

The dashcam footage is also insufficient for purposes of establishing the community caretaking exception, because the Court may not engage in "impermissible speculation . . . as to the specific circumstances surrounding the impoundment." *Gonzalez-Tzita*, 2016 WL 11518619, at *4. The footage does not provide enough context for the court to determine "the characteristics of the street, or where exactly [Odom] pulled over on the street." *United States v. Burgos*, 550 Fed. App'x 484, 486 (9th Cir. 2013).[6] In fact, according to Officer Guajardo's summary of the incident, Odom "yielded to the right-hard shoulder" on Liberty Avenue. ECF No. 43-1 at 20. This language "does not necessarily suggest that [Odom's] vehicle[] [was] illegally, unsafely, or obtrusively parked." *Gonzalez-Tzita*, 2016 WL 11518619, at *4.

The decision to frisk Odom directly flowed from the decision to remove Odom from the car in order to effectuate the tow. ECF No. 39 at 16 ("Given this suspicion and that Officer Guajardo would need to remove and interact with Odom in order to tow the vehicle, Officer Guajardo had a legitimate concern for his safety."). Therefore, the Government's failure to establish that a Fourth Amendment exception justified Officer Guajardo's decision to impound Odom's vehicle without a warrant requires the granting Odom's motion to suppress.

### 4. The Frisk

Even if the decision to tow Odom's car was constitutional, the Government would still need to establish that the pat search – conducted approximately 8 minutes after the traffic stop –

---

[6] The Court recognizes that this case is not binding precedent under Ninth Circuit Rule 36-3 but nonetheless relies on it as persuasive authority.

9

stemmed from Officer Guajardo's reasonable suspicion that Odom was armed and dangerous.  *See Arizona*, 555 U.S. at 330.  Defendants argue that the pat-down was valid because Officer Guajardo was reasonably concerned for his safety.  Odom, on the other hand, contends that the Government failed to carry its burden of showing individualized, reasonable suspicion regarding officer safety.

The stop-and-frisk standard strikes a balance between two competing interests.  On the one hand, a frisk for weapons "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly."  *Terry v. Ohio*, 392 U.S. 1, 17 (1968).  On the other hand, there is also a need to protect "law enforcement officers who confront potentially dangerous individuals."  *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016).  Mindful of these two interests, the Supreme Court crafted a standard that allows an officer to frisk a person during a traffic stop based on reasonable suspicion that the suspect is armed and dangerous.  *Arizona*, 555 U.S. at 330.  The relevant question is whether, after considering the totality of the circumstances, "a reasonably prudent [person] would have been warranted in believing [the suspect] was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior."  *Terry*, 392 U.S. at 28.  Importantly, the standard requires *individualized* reasonable suspicion.  *Maryland v. Buie*, 494 U.S. 325, 334 n.2 ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted.").

In applying this standard, the Ninth Circuit has identified "a wide variety of factors that can support a reasonable belief that an individual is armed . . . and dangerous."  *United States v. Flatter*, 456 F.3d 1154, 1157-58 (9th Cir. 2006).  In evaluating whether the factors establish reasonable suspicion, courts use "commonsense judgments and inferences about human behavior."  *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  In this case, the Government argues that Officer Guajardo's concern for his safety was based on "the time of day, Odom's nervousness, the inconsistent information Odom provided law enforcement, and Odom's gang activity and firearms-related criminal history."  ECF No. 39 at 13.  The Court examines how other courts have treated these factors before conducting a "totality of the circumstances" analysis.

### a) Time of Day

The fact that a stop occurs in the middle of the night is not enough, on its own, to support a finding of individualized reasonable suspicion. *See Murillo v. City of Woodland*, No. 2:09-cv-03117 KJN, 2011 WL 2038543, at *14 (E.D. Cal. May 23, 2011) (rejecting as insufficient justifications regarding generalized concerns about officer safety, the time of night at which the traffic stop occurred, and the lighting in the area). Were that sufficient, an officer could justify all frisks conducted at night, essentially confining Fourth Amendment protection to daylight hours. Both cases the Government cites involved the addition of other, stronger factors beyond merely the time of night. *See United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000); *United States v. Garner*, 152 Fed. App'x 612 (9th Cir. 2005). In *Mattarolo*, the court found an officer reasonably frisked a suspect who was being investigated for "a nighttime burglary," a crime where a suspect is "more likely to be armed." 209 F.3d at 1158. Similarly, in the unpublished case of *Garner*, the officer had "reasonable suspicion that [the suspect] might have committed vehicle theft, a serious crime in which the perpetrator could well be armed." 152 Fed. App'x at 613. Thus, the Court considers this factor, but finds it insufficient by itself to support a finding of individualized reasonable suspicion.

### b) Nervous behavior

Although the Supreme Court has recognized that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Wardlow*, 528 U.S. at 124, the Ninth Circuit refuses "to allow police officers to justify a *Terry* search based on mere nervous or fidgety conduct." *United States v. I.E.V.*, 705 F.3d 430, 438 (9th Cir. 2012) (citing cases). In determining how much weight to give this factor, as with all the factors, courts use "commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

In *Thomas*, the Ninth Circuit found that the fact that a suspect may have appeared "startled or fidgety" did not support an inference that he was armed because the officer acknowledged that such behavior is "a common reaction . . . when a police officer arrives on the scene." 818 F.3d at 884; *see also United States v. Chavez–Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001), *overruled on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005) (refusing to find that nervousness, even

11

extreme nervousness, sufficient on its own to support reasonable suspicion because "[e]ncounters with police officers are necessarily stressful for law-abiders and criminals alike"); *United States v. Cole*, 445 F. Supp. 3d 484, 490 (N.D. Cal. 2020) (finding nervous behavior entitled little if any weight because it is unsurprising "that a probationer in a high-crime area might repeatedly glace at a nearby patrol vehicle"); *cf. Wardlow*, 528 U.S. at 124 (finding that "headlong flight" from police officers, along with other factors, suggestive of wrongdoing).

### c) Prior Criminal History

"Although a prior criminal history cannot alone establish reasonable suspicion or probable cause to support a detention or an arrest, it is permissible to consider such a fact as part of the total calculus of information in these determinations." *Burrell v. McIlroy*, 464 F.3d 853, 858 n.3 (9th Cir. 2006). The Government cites only two published cases to support the proposition that the CRIMS record "heightened the dangerousness of the stop and added to the reasonable suspicion that Odom was armed and dangerous." ECF No. 39 at 14.[7] The first case, *Flatter*, merely notes

---

[7] The Government cites an unpublished case, *United State v. Perez*, 603 Fed. App'x 620, 622 (9th Cir. 2015). As stated in Ninth Circuit rule 36-3, "Unpublished dispositions and orders of this Court are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion." Furthermore, because memorandum dispositions typically lack a thorough description of the facts, well-developed reasoning, or "the nuance and breadth of precedential opinions, . . . memorandum dispositions are not only officially nonprecedential but also of little use to district courts or litigants in predicting how [the Ninth Circuit]—which, again, is in no way bound by such dispositions—will view any novel legal issues in the case on appeal." *Grimm v. City of Portland*, 971 F.3d 1060, 1067 (9th Cir. 2020). Thus, while "memorandum dispositions can be cited, and may prove useful, as examples of the applications of settled legal principles when a district court or litigant is interested in demonstrating how a given principle operates in practice, a nonprecedential disposition is not appropriately used . . . as the pivotal basis for a legal ruling by a district court." *Id.*

Given the fact-specific nature of the reasonable suspicion inquiry, *Perez* cannot be read as merely an "example[] of the application[] of settled legal principles." And even considered on its facts, *Perez* is distinguishable. In that case, "two sets of Border Patrol agents—each in a marked Border Patrol vehicle—independently observed Perez's vehicle abruptly decrease speed in response to coming into contact with the agents' vehicles. As agents trailed Perez's vehicle, she tailgated the car in front of her and had trouble keeping her vehicle within its traffic lane." *Perez*, 603 Fed. App'x at 621. Perez was also driving northbound on a highway that was a known smuggling route. *Id.* Finally, "agents testified at the suppression hearing that, while it is not unusual for motorists to slow down when they encounter a marked law enforcement vehicle, the

that violent criminal history is one factor, among many factors, to consider in a reasonable suspicion analysis. 456 F.3d at 1158. In the second case, *Burrell*, the Ninth Circuit found probable cause where several factors, including criminal history, suggested the suspect was armed and dangerous at the time of arrest. 464 F.3d at 858 (reasonable suspicion met pursuant to the following factors: (1) the suspect in *Burrell* was a felon who recently confessed to shooting his former girlfriend; (2) informants told the officers that the suspect just returned from purchasing cocaine in California; (3) an informant said he had seen the suspect cooking crack on the stove that day; and (4) an informant said that the suspect kept a gun in the bedroom of his apartment). On the other hand, in *Cole*, a court in this district found that knowledge of the suspect's criminal history and the fact that they were stopped in a "high crime area" insufficient to support a finding of reasonable suspicion. 445 F. Supp. 3d at 489.

Here, the Court considers this factor, although neither Officer Guajardo nor the Government describe the specifics of the "affiliations with criminal gang activity" or "firearms-related criminal history" Guajardo found when he ran a CRIMS check on Odom. See ECF No. 39-1 at 3 ("The CRIMS records check revealed that Odom had affiliations with criminal gang activity and that Odom had firearms-related criminal history."); ECF No. 43-1 at 7 (probable cause declaration) ("I conducted a search of Odom using Alameda Criminal Records Information Management System (GRIMS) which show Odom to be affiliated with criminal gang activity.").

### d) Inconsistent Information

Finally, the Government argues that Odom provided "inconsistent information" to law enforcement officers, which supports a finding of reasonable suspicion. ECF No. 39 at 13. According to Officer Guajardo's declaration, Odom stated "that the vehicle belonged to his sister who lived up the street from where the vehicle was currently stopped," when in fact, the vehicle "was registered to an address on 79th street in Oakland." ECF No. 39-1 ¶¶ 5, 7. Odom disputes

---

sudden decrease in speed of Perez's vehicle was abnormal and appeared to be an attempt to evade contact with the agents." *Id.* No similar facts are present here.

13

1    this characterization of the facts because Odom told Officer Guajardo that *he*, not his sister, lived

2    up the street.  ECF No. 42 at 22.  Therefore, Odom argues, there was no inconsistency between his

3    answer and the fact that his sister lived elsewhere.

4          The dashcam footage reveals the following: Officer Guajardo asked Odom how far he was

5    from home, and Odom responded, "literally right up the street."  Dashcam 2:21-2:23.  Officer

6    Guajardo then asked Odom whether the car was registered to his sister and Odom responded

7    "yeah."  *Id.* at 2:30-2:34.  Officer Guajardo said "okay," and a moment later Odom repeated, "it's

8    literally right up the street."  *Id*.  Based on the dashcam footage, the Court finds that Odom did not

9    provide "inconsistent information" to Officer Guajardo when he repeated "it's literally up the

10   street."  He had already established that his home was right up the street, and he did not state that

11   his sister lived up the street.  If Officer Guajardo thought that Odom provided inconsistent

12   information, he was mistaken.[8]

13         "A factual belief that is mistaken, but held reasonably and in good faith, can provide

14   reasonable suspicion for a traffic stop."  *United States v. Twilley*, 222 F.3d 1092, 1096 n.1 (9th

15   Cir. 2000).  The Ninth Circuit has found that officers possessed reasonable suspicion even though

16   they relied on third-party information that later turned out to be mistaken.  *See Rohde v. City of*

17   *Roseburg*, 137 F.3d 1142, 1143-44 (9th Cir. 1998) (holding that probable cause existed to arrest

18   driver where radio dispatcher erroneously told arresting officer that driver's vehicle was stolen and

19   driver produced only a vehicle title bearing another person's name); *United States v. Dorais*, 241

20   F.3d 1124, 1131 (9th Cir. 2001) ("Because the officers were acting on a police report from Dollar,

21   whose honesty had not been questioned, they had reasonable suspicion to stop the car.").  On the

22   other hand, the Ninth Circuit has also held that it will not allow a "chimera created by [an

23   officer's] imaginings [to] be used against the driver."  *Liberal v. Estrada*, 632 F.3d 1064, 1078

24   (9th Cir. 2011) (internal quotations and citation omitted) (finding it unreasonable that an officer

25   believed windows that were rolled down and could not be viewed at all were actually rolled up

---

[8] The Court notes that Officer Guajardo's declaration to establish probable cause for a warrantless arrest states that he conducted a pat search "[d]ue to the proximity with Odom, loose baggy clothing, [and] his known affiliation to being a gang member."  ECF No. 43-1 at 7.  It does not include inconsistent information in the list but notes it separately when stating the facts.  *Id.*

and tinted).

Was Officer Guajardo's mistake reasonable and in good faith? While it may have been in good faith, it was not reasonable. First, Officer Guajardo made the mistake himself; he did not rely on information provided by a third party. *Estrada*, 632 F.3d at 1078 (finding that the qualified immunity standard does not allow a "chimera created by an officer's imaginings to be used against the driver") (cleaned up). Second, Odom's statement was not inconsistent. There is no dispute that the question "where is home" is not the same as asking "where does your sister live?" Although it is true that Odom repeated the statement "it's literally right up the street" a few seconds after confirming the car belonged to his sister, he had already established that he was talking about his own home. Officer Guajardo could have asked Odom where his sister lived if he found the statement ambiguous. Because this mistake was not reasonable, the Court does not consider it in the totality of the circumstances.

### e) Totality of the Circumstances

In considering the "totality of the circumstances," the Court looks beyond the factors listed by the Government. *Thomas*, 818 F.3d at 877 ("Officers may not cherry pick facts to justify the serious Fourth Amendment intrusion a frisk imposes."). The dashcam footage shows, and the Government does not dispute, that Odom followed all of Officer Guajardo's instructions and answered all of Officer Guajardo's questions. Odom "immediately slow[ed] down and yield[ed]" when he realized the officers wanted to pull him over. ECF No. 39-1 ¶ 4. He told Officer Guajardo that he did not have a license, insurance, or registration, and produced his California identification card. *Id.* at ¶ 5. When Officer Guajardo asked Odom to exit the vehicle, he complied. ECF No. 39 at 7. The Government does not claim that Odom made any sudden movements or reached for an object that might have been a firearm. There is no claim that Officer Guajardo saw a bulge in Odom's clothing that may have been a gun. And Odom was pulled over for speeding, not a violation that is commonly associated with the possession of weapons.

Considering the totality of the circumstances in this case, the Court finds that the Government has not established that Officer Guajardo possessed individualized, reasonable suspicion that Odom was armed and dangerous at the time of the stop. The factors that

Defendants list do not justify the pat-down search, especially in light of Odom's cooperative behavior. First, the nighttime factor is weak and, without stronger factors demonstrating reasonable suspicion, it is not enough to justify the pat-down search. Second, based on "commonsense judgments and inferences about human behavior," *Wardlow*, 528 U.S. at 125, the Court finds the nervousness factor also provides little support for reasonable suspicion. There is nothing that suggests the nervousness Officer Guajardo observed went beyond the reaction any person might have to being pulled over by police officers in the middle of the night. *See Cole*, 445 F. Supp. 3d at 490 (finding nervous behavior entitled little if any weight because it is unsurprising "that a probationer in a high-crime area might repeatedly glace at a nearby patrol vehicle"); *Thomas*, 818 F.3d at 884 (finding that a suspect appeared "startled or fidgety" does not support even minimally the inference that the suspect was armed where the officer admitted that this is "a common reaction . . . when a police officer arrives on the scene). In fact, Odom's voice sounds calm and steady throughout the dashcam footage, lending further support to the conclusion that Odom was not unusually nervous. Therefore, these two factors provide minimal, if any, support to the reasonable suspicion analysis.

That leaves Odom's criminal history. Unlike in *Burrell*, where the officers possessed knowledge that the suspect was *currently* engaged in criminal activity, the officer in this case possessed nothing more than a list of prior charges. The fact that Odom may have been charged or convicted of prior firearm offenses or gang affiliations does not support a reasonable officer's inference that Odom was *currently* armed and dangerous at the time of the stop. To hold otherwise would permit officers to expand a stop into a separate criminal investigation every time they stop an individual at night who has prior gun convictions or gang affiliations, even if the suspect does not engage in any sudden movements or suspicious behavior. *See Cole*, 445 F. Supp. 3d at 489 (finding no reasonable suspicion where the officer stopped the suspect in a "high crime area" and knew of a suspect's criminal history, which included concealed firearms in a vehicle, prior arrests for firearm possession, and gang affiliations).

The Court also finds it significant that Officer Guajardo left Odom in his car for six minutes before removing him and conducting a frisk. "The fact that an officer had already

1  completed a large portion of his investigation of the vehicle without facing any threatening
2  behavior undermines the well-settled purpose of a *Terry* stop to allow the officer to pursue his
3  investigation without fear of violence." *I.E.V.*, 705 F.3d at 438 (cleaned up).  In *I.E.V.*, the Ninth
4  Circuit found that the officers "did not have the required 'immediate' need to protect themselves
5  or others from danger." *Id.* (quoting *Terry*, 392 U.S. at 23).  The officers in *I.E.V.* waited for a
6  minute or two before approaching the stopped vehicle, they asked the driver and passenger to exit
7  the vehicle and step 10 to 15 feet away, the officers asked a few questions, conducted a dog sniff,
8  and asked and received consent to search the vehicle.  *Id.*  Only then did the officers frisk the
9  driver and passenger.  *Id.*  The *I.E.V.* court analogized the case to *Thomas*, "where the officer did
10 not immediately frisk the suspect, but instead asked some investigatory questions first."  *Id.* (*citing*
11 *Thomas*, 863 F.2d at 628).  Even though the suspect in *Thomas* "did not give suspicious answers
12 and did not behave in a threatening manner, the officer decided to frisk him after some
13 investigation."  *Id.*  The Ninth Circuit criticized the officers in both *I.E.V.* and *Thomas* for
14 demonstrating a "perfunctory attitude towards frisking a suspect once a justified stop has
15 occurred."  *Id.* at 439 (internal quotations and citation omitted).

16     Here, two officers approached Odom in the middle of the night.  Officer Guajardo asked a
17 number of investigatory questions, including questions about the owner of the vehicle.  Officer
18 Guajardo claims that he noticed Odom's nervous behavior from the moment he spoke to him.  But
19 Officer Guajardo did not remove Odom from the vehicle and frisk him right away.  Instead, the
20 officers returned to their own car for another 6 minutes to run record searches.  The Government
21 does not claim that Odom's behavior changed in any significant way between the stop, initial
22 questioning, and removal from the vehicle.  He followed the officer's instructions, made no
23 sudden movements, and responded to all the officer's questions.  It is not enough to simply tell the
24 Court that a stop happened at night, that a suspect appeared nervous, and that he had a criminal
25 history.  The Government must do more to carry its burden.  The time of day does not provide
26 individualized suspicion.  And the fact that a person has a prior criminal record does not
27 sufficiently establish that he is *currently* armed and dangerous.  The Government has also not
28 shown that the nervousness went beyond the normal behavior of a person who is pulled over by

17

the police. The Government has therefore failed to carry its burden. Finding otherwise would allow "the needs of law enforcement to decimate the protections of the Fourth Amendment." *Id.* at 440 (cleaned up) (citing *United States v. Pineda-Moreno*, 617 F.3d 1120, 1121 (9th Cir. 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc)). Because the factors in this case do not add up to individualized reasonable suspicion that Odom was currently armed and dangerous, the Court finds that Officer Guajardo's frisk violated the Fourth Amendment.

### 5. The Exclusionary Rule

The exclusionary rule is a judicially created rule that, "when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). "The exclusionary rule generally applied in Fourth Amendment cases requires courts to suppress any evidence obtained as a 'direct result of any illegal search or seizure,' as well as 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *United States v. Ngumezi*, 980 F.3d 1285, 1290 (9th Cir. 2020) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Segura*, 468 U.S. at 804)). However, "[t]he fact that a Fourth Amendment violation occurred – *i.e.*, that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies." *Herring*, 555 U.S. at 140 (citation omitted). The government bears the burden of demonstrating that evidence obtained pursuant to an unconstitutional search or seizure should not be suppressed. *Ngumezi*, 980 F.3d at 1291.

Here, the Government argues suppression is unwarranted, citing *Davis v. United States*, 564 U.S. 229, 237 (2011); *Herring*, 555 U.S. at 137; and *Strieff*, 579 U.S. at 237. In all three of these cases, the Supreme Court asked whether suppression would deter police misconduct. *See Herring*, 555 U.S. at 137 (suppression "turns on the culpability of the police and the potential of exclusion to deter wrongful police misconduct"); *Davis*, 564 U.S. at 237 ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."); *Strieff*, 579 U.S. at 241 (noting that the "exclusionary rule exists to deter police misconduct"). *Herring* and *Strieff*, however, both involved applications of the attenuation doctrine, where "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Strieff*, 579 U.S. at 238; *see also Herring*, 555 U.S. at 146

18

(refusing to apply the exclusionary rule where officer relied on database, finding the conduct "not so objectively culpable as to require exclusion"). The unconstitutional frisk in this case led directly to the finding of the firearm. Therefore, the attenuation doctrine does not apply.

Another doctrine, the good-faith exception, arose in both *Herring* and *Davis*. "The test for good faith is an objective one: 'whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances.'" *United States v. Camou*, 773 F.3d 932, 944 (9th Cir. 2014) (quoting *Herring*, 555 U.S. at 145). In applying the good faith exception, the Supreme Court has never "excuse[d] an officer who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights." *Id.* at 945. In *Herring* the Court applied the good faith exception to an officer who relied on a county warrant clerk's assertion that the defendant had an outstanding warrant, which was in turn based on another clerk's negligence. 555 U.S. at 137-38, 146. Similarly, in *Davis*, the Court found that the good faith exception applied to a police search that was "in compliance with binding precedent that [was] later overruled." *Davis*, 564 U.S. at 232.

In this case, there is no question that Officer Guajardo's conduct "directly led to the violation of [Odom's] constitutional rights." *Camou*, 773 F.3d at 945. He frisked Odom even though the "totality of the circumstances" failed to support reasonable suspicion that Odom was *currently* armed and dangerous. In making this improper calculus, Officer Guajardo did not rely on a subsequently invalidated statute, a third-party's mistaken assertion, or false information from a database. He came to the unreasonable conclusion himself; a conclusion that a "reasonably well trained officer would have known was . . . illegal in light of all the circumstances." *Id.* at 944. The Government has not provided any authority extending the good faith exception to an officer whose conduct directly led to the violation of the defendant's constitutional right. Therefore, suppression is appropriate in this case.

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

For the reasons set forth above, the Court grants the motion to suppress.

**IT IS SO ORDERED.**

Dated:  March 2, 2022



JON S. TIGAR
United States District Judge